

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| IBM CORPORATION, | ) | |
| | ) | |
| Respondent/Cross-Appellant, | ) | |
| | ) | |
| vs. | ) | No. SC94999 |
| | ) | |
| DIRECTOR OF REVENUE, | ) | |
| | ) | |
| Appellant/Cross-Respondent. | ) | |

**PETITION FOR REVIEW OF A DECISION OF THE ADMINISTRATIVE
HEARING COMMISSION**
The Honorable Sreenivasa Rao Dandamudi, Commissioner

*Opinion issued April 5, 2016*

The Director of Revenue seeks review[1] of the Administrative Hearing Commission's decision that IBM Corporation is entitled to a use tax refund under section 144.054.2[2] for its sales of hardware and software to MasterCard International, LLC, for MasterCard's use in processing credit and debit card transactions. MasterCard communicates information between merchants and banks and determines whether customers' purchases should be approved and whether a bank owes money or fees on the transaction. The Commission found that MasterCard's use of the hardware and software qualified as "manufacturing a product" as that term is used in the use tax exemption set

---

[1] Although IBM is also listed as a cross-appellant, it determined not to pursue its cross-appeal before this Court.
[2] Unless otherwise indicated, citations are to RSMo 2000 or RSMo Supp. 2013.

out in section 144.054.2.  This Court reverses.

IBM is not entitled to an exemption from use tax because MasterCard's use of the hardware and software does not qualify as the "manufacturing of any product" under section 144.054.2, which provides an exemption from sales or use tax for "equipment[] and materials used or consumed in the manufacturing, processing, compounding, mining, or producing of any product …."  Interpretation of the word "manufacturing" (and of its near synonym, "processing") as used in this statute is governed by the well-established principle that an exemption must be narrowly and strictly interpreted against the taxpayer according to its plain and ordinary meaning.[3]

While IBM is correct that the organization and creation of intangible products such as computer data *can* constitute manufacturing, it does not follow that the term "manufacturing" should be broadly interpreted to include MasterCard's use of computers to transmit financial information between its customers and banks.  This expansive reading of "manufacturing" goes too far.  Products, whether tangible or intangible, still must undergo "the alteration or physical change of an object or material in such a way that produces an article with a use, identity, and value different from the use, identity, and value of the original," *Galamet, Inc. v. Dir. of Revenue, 915 S.W.2d 331, 333 (Mo. banc 1996)*, to be manufactured.

Here, IBM does not create or transform a product; it provides equipment that

---

[3] *See, e.g., Ben Hur Steel Worx, LLC v. Dir. of Revenue, 452 S.W.3d 624, 626–27 (Mo. banc 2015); Union Electric Co. v. Dir. of Revenue, 425 S.W.3d 118, 124 (Mo. banc 2014); Brinker Missouri, Inc. v. Dir. of Revenue, 319 S.W.3d 433, 437 (Mo. banc 2010).*

allows merchants to check their customers' credit information while completing and approving a purchase. If such transmission of information is manufacturing, then so is the use of any computer to answer a customer's query. If the legislature wished to exclude from the use tax all computers used by financial institutions to provide credit information, or all computers used to answer customer queries, it could have done so. *Cf. Utilicorp United, Inc. v. Dir. of Revenue, 75 S.W.3d 725 (Mo. banc 2001).* But it did not.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

MasterCard purchased computer hardware and software from IBM for use in providing various financial services to its customers. The core services it provided are what it calls its "ACS" services – authorization, clearing, and settlement of transactions made with MasterCard-issued credit and debit cards.[4]

During "authorization," when a customer presents a credit or debit card to a merchant to make a purchase, the merchant sends information concerning the transaction to the merchant's bank, called the "acquiring bank." The acquiring bank sends that information to MasterCard, which sends it to the bank that issued the credit or debit card to the customer, called the "issuing bank." The issuing bank decides whether to accept or decline the transaction and sends its decision to MasterCard. MasterCard forwards the issuing bank's decision to the acquiring bank, which forwards it back to the merchant.

---

[4] Aside from these core ACS services, MasterCard also provides several ancillary services including "InControl," "Fraud Scoring," and data warehousing.

In "clearing," merchants send periodic data concerning their transactions to their acquiring banks, which communicate the data to MasterCard. MasterCard aggregates the data received from acquiring banks and calculates the sums due from each issuing bank to each acquiring bank based on how much the acquiring bank has loaned to its customers – the merchants. The net amount of funds owed by or to a particular bank is called a "settlement position." In "settlement," MasterCard communicates the settlement positions it calculated to each issuing bank. If the issuing bank owes money, it remits the amount owed to MasterCard's settlement bank, which remits the money owed to each acquiring bank that is owed money, after deducting its fee.

In 2012, IBM filed a use tax return on behalf of MasterCard for purchases of computer hardware and software. IBM claimed that the equipment it sold to MasterCard was exempt from use tax because MasterCard's activities qualify as "manufacturing" under section 144.054.2, which exempts "equipment[] and materials used or consumed in the manufacturing, processing, compounding, mining, or producing of any product …." The Commission found against the Director and granted IBM a refund, finding that MasterCard's activities could not be distinguished from cases in which the Commission believed this Court broadly construed the manufacturing exemption, especially *Southwestern Bell Tel. Co. v. Dir. of Revenue*, 182 S.W.3d 226 (Mo. banc 2005) *("Bell II")*, in which this Court held that the transmission of a voice over telephone lines qualified as "manufacturing." The Director seeks review.

II. *STANDARD OF REVIEW*

3

Because this case involves the construction of a revenue law of this state, this Court has exclusive appellate jurisdiction. *Mo. Const. art. V, § 3*. This Court reviews the Commission's interpretation of a revenue statute *de novo*. *Fred Weber, Inc. v. Dir. of Revenue, 452 S.W.3d 628, 629-30 (Mo. banc 2015)*. The Commission's decision will be "upheld when authorized by law and supported by competent and substantial evidence upon the whole record, if a mandatory procedural safeguard is not violated" so long as the Commission's decision is not contrary to what the Court concludes were the reasonable expectations of the legislature. *§ 621.193*.

"Tax exemptions are strictly construed against the taxpayer." *Ben Hur, 452 S.W.3d at 626*. "A taxpayer must show by 'clear and unequivocal proof' that it qualifies for an exemption, and all doubts are resolved against the taxpayer." *Fred Weber, 452 S.W.3d at 630*. This Court interprets statutes in a way that is not hypertechnical but instead is reasonable and logical and gives meaning to the statute and the legislature's intent as reflected in the plain language of the statute at issue. *Id*.

### III. MASTERCARD'S ACTIVITIES ARE NOT THE "MANUFACTURING OF A PRODUCT" UNDER SECTION 144.054.2

To qualify for the use tax exemption under section 144.054.2, IBM must show: (1) that MasterCard sold equipment or materials used or consumed (2) during the *manufacturing*, processing, compounding, mining, or producing (3) of a product. *Fred Weber, 452 S.W.3d at 630*. The taxpayer has the burden of proof. *Id*. If IBM fails to meet any of these three criteria, it does not qualify for the exemption under section

4

144.054.2. *Id*. IBM's failure to meet the second requirement is dispositive here.

IBM argues that MasterCard's activities qualify as "manufacturing a product" under section 144.054.2 and, therefore, it is entitled to an exemption from use tax for the computer hardware and software it sold to MasterCard. IBM claims that when MasterCard transmits approvals and disapprovals of credit card transactions and summarizes the credit card transactions undertaken each day by its customers, MasterCard organizes, manipulates, and communicates data and by doing so, manufactures new products during every transaction. This Court disagrees.

While this Court has held that the production of intangible products such as computer data may be "manufacturing," it has rejected the idea that every use of a computer to aid a business or transmit information is "manufacturing." Such an interpretation of the term "manufacturing" would be at odds with the fundamental principle, long recognized and applied in Missouri, that exemptions are to be construed narrowly against the taxpayer. *See, e.g., State ex rel. Mount Mora Cemetery Ass'n v. Casey, 109 S.W. 1, 4 (Mo. 1908)*; *Salvation Army v. Hoehn, 188 S.W.2d 826, 114 (Mo. 1945); Kansas City Power & Light Co. v. Dir. of Revenue, 783 S.W.2d 910, 911 (Mo. banc 1990); Union Electric, 425 S.W.3d at 120*.

This Court's decisions in *Utilicorp* and the *Bell* cases were among its first attempts to integrate fast-changing technology into the decades-old exemption for manufacturing. In *Utilicorp*, the utility company claimed a manufacturing exemption for the equipment used in the transmission of electricity to its customers. *Utilicorp, 75 S.W.3d at 725–26.*

5

The Court rejected this argument, stating, "Though volts and amperes may change during the transmission and distribution, not every change is 'manufacturing.'" *Id. at 729*. In other words, the fact that some intangible products *can* be manufactured does not mean that all intangibles are manufactured products. Equipment used in the transmission and distribution of electricity, *Utilicorp* concluded, "is not, in the words of section 144.030.2(4) and (5), 'used directly' in manufacturing" and so was not subject to the exemption. *Id.*

In *Southwestern Bell Tel. Co. v. Dir. of Revenue, 78 S.W. 763 (Mo. banc 2002) ("Bell I")* and *Bell II*, the Court faced the issue of how to apply the terms "product" and "manufacturing" to technologies that could not even have been imagined at the time that the manufacturing exemption was enacted. As *Bell II* said:

> As technology has evolved, consideration has been given to how the manufacturing exemption applies when a company's machinery and equipment is connected by telephone lines and via data processing connections. As noted in *Bell I*, this case requires the application of a statutory framework that first took shape in the thirties and forties to current technology.

*Bell II, 182 S.W.3d at 229* (internal quotation marks omitted). *Bell I* similarly had noted:

> [T]he growth of modern information and communication technologies has challenged lawmakers and courts to keep pace with modern industry. One area of specific difficulty in Missouri has been the application of the manufacturing sales and use tax exemptions to intangible products or services.

*Bell I, 78 S.W.3d at 766.*

In an attempt to update the definition of "manufacturing" so that it could apply to modern technology, *Bell I* and *II* stated that voices transmitted over a telephone are "products" that are "'manufactured' into electronic impulses that can be transmitted and reproduced into an understandable replica." *Bell I, 78 S.W.3d at 768.* *Bell I* continued, "The end 'product' is not the same human voice, but a complete reproduction of it, with new value to a listener who could not otherwise hear or understand it." *Id.; see also Bell II, 182 S.W.3d at 232*.

IBM premises its argument for the application of the exemption to it on its reading of *Bell I* and *Bell II* as applying a broad rather than strict definition of "manufacturing" and argues that this Court should expand the manufacturing exemption to include just the transmission of computer data itself. This broad interpretation, IBM says, would allow this Court to treat the transmission and analysis of credit information among MasterCard, its customers and servicing banks as a form of "manufacturing" and so subject to the exemption. IBM's argument is inconsistent with the well-settled principle that:

> Courts are instructed by the legislature to take the words in a statute in their plain and ordinary sense. The plain meaning of words, as found in the dictionary, will be used unless the legislature provides a different definition.

*Lincoln Industrial, Inc. v. Dir. of Revenue, 51 S.W.3d 462, 465 (Mo. banc 2001)* (internal citations omitted). Furthermore, to the extent that *Bell I* and *Bell II* invited this proposed further expansion of the meaning of "manufacturing" in their attempt to apply the term to new technologies, their reasoning was at variance with the well-established rule that

7

"[e]xemptions from taxation are to be strictly construed against the taxpayer, and any doubt is resolved in favor of application of the tax." *Brinker, 319 S.W.3d at 436.*

Narrowly construing the term "manufacturing" as used in the exemption in question, MasterCard's computers do not "manufacture" a tangible or intangible product. Rather, they receive information, analyze and make determinations based on this information, and relay these determinations to their customers. This type of activity is not "manufacturing" under section 144.054.2 or under the common lay terminology one uses in speaking of analyzing credit card transactions. *See Union Electric, 425 S.W.3d at 123.* Otherwise, every time a person received an email, made some type of business or mathematical decision, and sent back an email with that decision, the person would be said to be "manufacturing" the data sent and received. That these calculations were done using sophisticated hardware and software does not change the fact that the activity is not "manufacturing."

Indeed, even the dissenting opinion in *Brinker*, which complained of the failure to give exemptions a broad construction, drew a distinction between transformation of a product and mere transmission of information, agreeing the latter is not "manufacturing," stating:

> Acts that fall outside [the meaning of "manufacturing" in] subdivisions (4) and (5) generally involve repairing or transmitting products rather than creating output that has a distinct use, identity or value. *See Utilicorp United v. Dir. of Revenue,* 75 S.W.3d 725, 729 (Mo. banc 2001) (transmitting or distributing electricity); *Unitog Rental Services v. Dir. of Revenue,* 779 S.W.2d 568, 570–71 (Mo. banc 1989) (cleaning and repairing uniforms) ….

*Brinker, 319 S.W.3d at 441–42 (Price, J., dissenting)*. To give section 144.054.2 the expansive meaning sought by IBM would conflict with this Court's century-old requirement of strictly construing tax exemptions against the taxpayer. *See, e.g., Casey, 109 S.W. at 4.*

This determination is supported by the principle noted in many of this Court's recent cases that it would be inconsistent with the appropriate standard of review to expand the meaning of words such as "manufacturing" and "processing" beyond their normal meaning to encompass activity that the legislature easily could have made subject to the statute had it so intended. *Ben Hur* and *Fred Weber* provide good examples of the application of this principle.

Both cases concerned the meaning of "manufacturing" as used in the exemption set out in section 144.054.2 for "equipment[] and materials used or consumed in the manufacturing, processing, compounding, mining, or producing of any product …." In *Fred Weber*, the Court rejected the claim that rock sold to paving companies for use in making asphalt to lay down pavements should be exempt from sales tax under section 144.054.2 because the process of making asphalt and laying pavements does not qualify as "manufacturing," but rather as "construction." *452 S.W.3d at 628, 631, citing, Union Electric, 425 S.W.3d at 124*. But the word "construction" does not appear in section 144.054.2, "nor do any words that would be associated with construction activities." *Fred Weber, 452 S.W.3d at 631*. This Court held that, had the legislature intended to

exempt construction activities, it would have done so as it has in other tax exemptions within chapter 144, and rejected the taxpayer's attempt to fit its construction activities within the manufacturing exemption. *Id.*

*Ben Hur* reached this same result in denying a "manufacturing" exemption to a taxpayer for the purchase of beams used to construct steel frames for commercial buildings and structures. *452 S.W.3d at 625*. This Court held that the taxpayer engaged in construction, not "manufacturing," and so the exemption did not apply. *Id. at 627.*

In other recent cases, this Court has refused to expand the term "manufacturing" to the broad limits argued for by IBM. In *Brinker*, this Court rejected the taxpayer's argument that a restaurant was engaged in "manufacturing" when it prepares, cooks, and serves food. *319 S.W.3d at 435*. The Court held that "[i]n lay terminology, one does not speak of a restaurant as manufacturing or producing food or drink; instead, restaurants prepare, cook and serve food and drink to their customers." *Id. at 438*. This holding was quoted in *Union Electric* in which the Court held – similarly to *Brinker* – that a bakery that made baked goods from scratch was not engaged in "manufacturing." *Union Electric, 425 S.W.3d at 123–24*. "One does not speak of a grocery store bakery department as 'processing' baked goods any more than one speaks of it as manufacturing, compounding or producing such goods." *Id.* at 124. These cases reflect a consensus by this Court to interpret the term "manufacturing" based on the "common sense meaning of [the word]." *Bell II, 182 S.W.3d at 239 (Stith, J., dissenting).*

Applying the principles set out in the above cases here, had the legislature

10

intended financial transactions or computer communications to be subject to the exemption set out in section 144.054.2, it easily could have added such language to the statute. As in *Fred Weber,* no terms relating to credit cards, electronic or computerized calculations or transmissions are found anywhere in section 144.054.2. They *are* found in the exemption for "equipment used or consumed directly in *television or radio broadcasting* …," *§ 144.054.3* (emphasis added), and in section 144.030.2(9) that exempts "*computers* … used in producing newspapers …." (Emphasis added). In fact, chapter 148 is titled "Taxation of Financial Institutions" and contains tax statutes relating to banks, *credit institutions*, and insurance companies. Had the legislature intended section 144.054.2 to apply to the processing of credit card transactions, it could have included additional language within the exemption so indicating, rather than relying on an unreasonably broad interpretation of "manufacturing" inconsistent with this Court's most basic rule of interpreting exemptions narrowly. Moreover, one does not speak of the transmission and analysis of credit card data as "manufacturing." For in lay terminology, such activity is not applicable to the term. To extend the manufacturing exemption to this activity would be to ignore this Court's rule strictly construing exemptions against the taxpayer. MasterCard's activities are not "manufacturing" under section 144.054.2, the hardware and software sold by IBM is not exempt from use tax, and it was error for the Commission to grant IBM's request for a use tax exemption.

Greater familiarity with computer and other electronic technology and greater experience with the application of the word "manufacturing" in cases such as *Brinker,*

*Ben Hur, Fred Weber* and *Union Electric,* have demonstrated that expanding the statutory definition of "manufacturing" in the *Bell* cases put the Court too far down a slippery slope. To the extent cases such as *Bell I* and *Bell II* suggest that an expansive interpretation of the word "manufacturing" is authorized by the "manufacturing" exemption, and to the extent that they hold that the electronic transfer of voices is itself manufacturing as that term is used in the exemption, they are no longer to be followed.[5]

## IV. CONCLUSION

The Commission erred in reversing the Director's decision and granting IBM's request for a use tax exemption for the computer hardware and software it sold to MasterCard. MasterCard's activities do not qualify as the "manufacturing of a product" under this Court's strict interpretation of exemptions. IBM is not entitled to a use tax exemption for the hardware and software it sold to MasterCard. The Commission's decision is reversed.

_____
**LAURA DENVIR STITH, JUDGE**

All concur.

---

[5] In addition, to the extent that the Commission and IBM read this Court's cases prior to *Bell I* and *II* to permit a broad rather than a narrow reading of exemptions, they are in error. The Commission should have read the exemption narrowly and held that the mere transmission and analysis of computer information is not the manufacturing of a product.